UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GREGORY MANASHER and
FRIDA SIROTA,

       Plaintiffs,


v.                                    Case No. 06-10749
                                    Hon. Sean F. Cox


NECC TELECOM,

       Defendant.

_____

### OPINION AND ORDER

This matter is before the Court on Defendant's Motion to compel arbitration and to dismiss. Both parties have fully briefed the issues and a hearing was held July 13, 2007. For the following reasons, the Court **DENIES** Defendant's Motion to compel arbitration; and **GRANTS** in part, and **DENIES** in part, Defendant's Motion to dismiss. Plaintiffs' claims for: (1) breach of the duty of good faith and fair dealing; (2) fraud; (3) unjust enrichment; and (4) negligence are dismissed. Plaintiffs' claims for: (1) violation of 47 U.S.C. §§201(b), 206 and 207; (2) breach of contract; and (3) violation of the Michigan Consumer Protection Act remain. Further proceedings are **STAYED** pending resolution by the FCC of Plaintiff's claim for violation of 47 C.F.R. § 64.2401.

### I.    BACKGROUND

This action arises out of the allegedly faulty billing system and business practices of

1

Defendant NECC Telecom, Inc. Defendant is a telecommunications company that provides local, long distance, and international telephone service. Plaintiffs, Gregory Manasher and Frida Sirota, were customers of Defendant. Plaintiffs seek to bring this claim as a class action.

Defendant provided Plaintiffs with monthly itemized bills detailing telephone charges and fees. Plaintiffs claim they were charged fees they did not agree to. Defendant admits that Plaintiff Sirota was erroneously charged a late payment fee. Plaintiff Manasher claims he was told there would be no fees, only a per minute rate. Additionally, on both Plaintiffs' statements, the itemized amounts for calls did not equal the amount shown in the total column. Both Plaintiffs paid the incorrect amount shown in the total column of the statement.

On January 31, 2006, Plaintiffs filed a Complaint, individually and as a class action, in the Wayne County Circuit Court. The class includes all persons or entities in the United States that use Defendant's services and were charged illegal fees. Defendant removed to this Court on February 17, 2006. On December 12, 2006, Plaintiffs filed a First Amended Complaint alleging: (1) violation of the Communications Act and Truth-in-Billing Act; (2) breach of contract and breach of the duty of good faith and fair dealing; (3) fraud; (4) unjust enrichment and disgorgement; (5) negligence; (6) violation of the Michigan Consumer Protection Act; and (7) entitlement to equitable relief. On January 30, 2007, Defendant filed a Motion to compel arbitration and to dismiss.

## II.    STANDARD OF REVIEW

"[A] complaint may be dismissed for failure to state a claim upon which relief can be granted. The court must construe the complaint in a light most favorable to the plaintiff, and accept all of [his] factual allegations as true. When an allegation is capable of more than one

2

inference, it must be construed in the plaintiff's favor. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998)(citation omitted). The plaintiff is not required to provide detailed factual allegations, but must "provide the grounds of his entitlement to relief" by offering more than "labels and conclusions." *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007). A formulaic recitation of the elements of a cause of action is insufficient to state a claim. *Id*. at 1965. The plaintiff is required to plead enough facts to state a claim to relief that is plausible on its face. *Id*. at 1974.

### III.   ANALYSIS

#### A.   Is There a Binding Arbitration Agreement?

The parties dispute whether the "Disclosure and Liabilities" agreement applies to the contract between Plaintiffs and Defendant. Plaintiffs argue there is no evidence of a binding contract between the parties that includes an arbitration clause. The undisputed facts are that Plaintiffs were contacted by telemarketers from Defendant. They agreed on financial terms for long distance phone service. After the phone service began, Plaintiffs received an invoice. The second page of the invoice has five boxes containing five statements. The titles of the five statements are: (1) Recurring Fee; (2) Referral Discount 5%; (3) Preferred Customer Plan 'PCP,' Standard Customer Plan 'SCP;' (4) Rates; and (5) Agreement (Disclosure and Liabilities). [Motion, Exhibit D and E]. The fifth box, containing the statement regarding the "Disclosure and Liabilities" is at issue. The statement provides "NECC's Agreement "Disclosure and Liabilities" can be found online at www.necc.us or you could request a copy by calling us at (800) 766 2642." *Id*. The separate Disclosure and Liabilities Agreement provides:

This agreement ("Agreement") provides you with guidelines for using our

interstate and international long distance Services. PLEASE READ THESE TERMS AND CONDITIONS CAREFULLY AND RETAIN THIS DOCUMENT FOR YOUR FUTURE REFERENCE. This Agreement governs the relationship between you and NECC Telecom, Inc. ("NECC") and explains our respective legal rights concerning all aspects of our relationship, including:
• Billing an charges
• Starting and ending service
• Privacy and confidentiality
• Early termination fees (if applicable)
• Limitations of liability and warranties
• Resolution of disputes by arbitration instead of court proceedings and class actions

By subscribing to our Services, you are agreeing to abide by the terms and conditions of this Agreement. If you are an existing customer, your continued use of or subscription to our Services represents your acceptance of these terms and conditions of service. If you do not agree to the terms and conditions set forth in this Agreement, please contact us prior to using our Services or as soon as possible thereafter, and cancel your subscription by notifying us at our toll-free customer service number (800) 766-2642. NECC will terminate your ability to make calls using our Service; however, you must make arrangements to switch to a new telephone company for continued long distance service.

[Motion, Exhibit G]. The Disclosure and Liabilities Agreement contains an arbitration

provision:

Any disputes that arise between the Parties, except for those disputes that fall within the jurisdiction of a state or federal regulatory body, shall be exclusively resolved by binding arbitration pursuant to the Commercial Arbitration Rule of the American Arbitration Association with arbitration to occur in Jeffersonville, Indiana. The Parties agree that their disputes will be resolved individually and shall not be resolved on a consolidated or class basis. The arbitrator(s) may award declaratory relief, preliminary and permanent injunctive relief, and compensatory damages. The Parties further agree to waive, to the fullest extent permitted by law, any claim for incidental, consequential or punitive damages. To the extent such damages may not be so waived , if an arbitrator decides to award such damages they shall be limited to the total amount of service charges between the parties.

*Id*.

Defendant argues that this statement on the invoice is sufficient to incorporate by

reference the separate "Disclosure and Liabilities Agreement."  Plaintiffs argue that this single reference to "Disclosure and Liabilities" is insufficient to make the Disclosure and Liabilities Agreement a part of the contract between the parties.

It is irrelevant whether Plaintiffs actually read the arbitration provision of the Disclosure and Liabilities Agreement if the Disclosure and Liabilities Agreement was incorporated by reference into the contract between the parties.  See *Ginsberg v. Myers*, 215 Mich. 148, 150-151 (1921).  "Where one writing references another instrument for additional contract terms, the two writings should be read together."  *Forge v. Smith*, 458 Mich. 198, 207 (1998).  "In a written contract a reference to another writing, if the reference be such as to show that it is made for the purpose of making such writing a part of the contract, is to be taken as a part of it just as though its contents had been repeated in the contract."  *Id*. at 208, n.21 (citing *Whittlesey v. Herbrand Co.*, 217 Mich. 625, 628 (1922)).  The *Forge* Court also quoted the Arizona Supreme Court:

> Although neither physical attachment nor specific language is necessary to incorporate a document by reference, the incorporating instrument must clearly evidence an intent that the writing be made a part of the contract.  When the question of whether another paper or term has been incorporated by reference depends on the 'exercise of speculation, surmise and conjecture' the court will refuse to rewrite the contract.

*Id*. at n.21(citing *United California Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 258 (1983)).  See also *NILAC Intern. Marketing Group v. Ameritech Services, Inc.*, 362 F.3d 354, 358 (6th Cir. 2004)(under Michigan law "incorporating instrument must clearly show intent that outside document be considered part of the contract.").

Defendant directs the court to three cases to demonstrate that the language used on the invoice was sufficient to incorporate the Disclosure and Liabilities Agreement by reference.

First, Defendant refers the court to *Treiber & Straub, Inc. v. United Parcel Service, Inc.*, 474

F.3d 379, 385 (7th Cir. 2007), for the proposition that terms from a website are binding. [Supp.

Brief, p.6]. In *Treiber*, the plaintiff used UPS next-day air shipment service, accessed online via

the UPS website, to ship a diamond valued at over $100,000. UPS's terms and conditions

provided that it would not ship items of "unusual value," i.e. over $50,000. Nonetheless, the

plaintiff shipped the diamond and purchased insurance for $50,000. The diamond was lost

during shipment. The plaintiff argued that the terms and conditions did not apply because they

were "not prominent enough and were thus not properly drawn to his attention." *Id*. at 382.

When the plaintiff shipped the diamond, using the website, he had to click twice on a box stating

that he agreed to UPS's terms and conditions, which included the provision for items of unusual

value. The court held, pursuant to federal common law, that UPS provided adequate notice of

the unusual value exception, and that although UPS "may not have provided one single document

that explained everything about the limitation of liability...[t]he fact that Straub had to agree not

once, but twice, to abide by the Terms and Conditions set forth in order to ship the package, is

enough to insure that Treiber had clear and reasonable notice of the rules." *Id*. at 385.

     *Treiber* is inapplicable to this case. Unlike *Treiber*, this case does not rely on federal

common law, but on Michigan contract law. Further, Plaintiffs made no affirmative indication

that they agreed to the Disclosure and Liabilities Agreement, like the plaintiff in *Treiber* did by

clicking on the box indicating that he agreed with the terms and conditions. Although the court

did find that the terms and conditions contained on a website were binding, it did so based on the

reasonable notice provided by the defendant and on the affirmation, twice, by the plaintiff that he

agreed to the terms and conditions.

The next case relied on by Defendant is *Briceno v. Sprint Spectrum, L.P.*, 911 So.2d 176 (Fla.App. 2005). Defendant states that this case found "on similar facts, that the plaintiff was bound to arbitrate where defendant informed customers through invoices to visit the company's website or call to obtain the terms and conditions of their agreements." [Supp. Brief, pp.6-7]. Defendant mischaracterizes *Briceno*. The facts are not similar. In *Briceno*, the court was deciding whether an arbitration clause was unconscionable, not whether it was incorporated by reference. The plaintiff in *Briceno* purchased a cellular phone from the defendant, Sprint. After taking the phone in for service, Sprint employees allegedly accessed the plaintiff's personal photographs and displayed them on the internet. The plaintiff brought an action alleging various invasion of privacy claims. Sprint sought to compel arbitration pursuant to the applicable Terms and Conditions. The court noted that it was Sprint's customary business practice to include the Terms and Conditions in the packaging of telephones. Further, the plaintiff had changed her Sprint telephone four times between her initial phone purchase and the alleged incident. It was also customary for Sprint to include the Terms and Conditions in the telephone box for the changes. The question before the court was whether the arbitration clause added in an amended Terms and Conditions was unconscionable. The court set forth the factors it was to consider, one of those factors was "the concealing of clauses which are disadvantageous to one party in a mass of fine print or in places which are inconspicuous to the party signing the contract." *Id*. at 180. In addressing this factor, the court stated:

> Also, there is no evidence that Sprint concealed or attempted to conceal the aforementioned original or amended Terms and Conditions. When an amendment was made, the first page of each invoice state that the Terms and Conditions were periodically amended and listed two ways in which customers could access information about any changes. Each month, an invoice was mailed to Briceno.

As Sprint periodically amended its Terms and Conditions and printed them immediately below the amount due, several of Briceno's invoices warned her to check for recent changes. Specifically, her June 16, 2003 invoice stated:

> **Important Notice Regarding Your PCS Service from Sprint**
> The Terms and Conditions of PCS Service from Sprint have changed. To view the current version, please visit www.sprintpcs.com or press *2 on your PCS Phone and request a copy from a PCS Customer Solutions Specialist.

As Briceno had a fair and clear warning of changes, conspicuously given on the first page of her invoice, there was no unfair surprise in this case which would reach the level of unconscionability.

*Id.* at 180.

*Briceno* is not similar to this case. Here, the issue is not whether the arbitration agreement is unconscionable, or whether Defendant attempted to conceal it. Rather, the issue is whether the statement on the invoice regarding Disclosure and Liabilities was sufficient to incorporate that document by reference into the contract between the parties. Unlike Briceno, who was initially, and several times thereafter, provided with the actual Terms and Conditions Agreement from Sprint, there is no indication that Plaintiffs were ever given the actual Disclosure and Liabilities Agreement. The only reference to the Disclosure and Liabilities Agreement is the fifth statement on the second page of Plaintiffs' invoice. Notably, in *Briceno*, the notice was on the first page of the invoice, just below the amount due, and the first sentence was in bold print. Additionally, the notice stated that it regarded "*Your* PCS Service from Sprint." In contrast, Defendants reference to the Disclosure and Liabilities Agreement was the last of five statements in plain type on the second page of the invoice, and did not explicitly state that it applied to the consumer's agreement with Defendant. Thus, *Briceno*, does not have similar facts, and does not decide a similar legal issue.

The last case cited by Defendant is the unpublished district court case *Hugger-Mugger, LLC v. Netsuite, Inc.*, 2005 WL 2206128 (D.Utah 2005). Defendant cites this case for the proposition that terms available on a website are properly incorporated. [Supp. Brief, p.7]. In *Hugger-Mugger*, the plaintiff had a License Agreement with the defendant whereby the defendant was to provide an online business application. When litigation ensued, the defendant sought to enforce a forum selection clause contained in the Terms of Service it argued was incorporated by reference into the License Agreement. The defendant also argued the Terms of Service were binding because the plaintiff clicked on a box indicating agreement to be bound when installing the computer software. The court found that under California law, the written License Agreement incorporated by reference the Terms of Service contained on the defendant's website. The License Agreement stated:

> In consideration of the license fee paid by Customer Hugger-Mugger and *subject to the terms of this agreement and the Terms of Service* posted at www.NetSuite.com, or successor Web site, NetSuite grants Customer, its employees, and agents a nonexclusive, nontransferable license to use the Service for internal business purposes...
>
> This Agreement and *Incorporated Terms of Service* represent the entire agreement of the parties and may not be modified unless expressly agreed to in writing by both parties.

*Hugger-Mugger*, 2005 WL 2206128, *4 (emphasis original). The court also found the Terms of Service were assented to via the box the plaintiff clicked when downloading the software.

Similar to *Treiber* and *Briceno*, *Hugger-Mugger* is also unavailing. The language in the License Agreement, as described by the *Hugger-Mugger* court, "clearly and unequivocally refers to, identifies, and incorporates by reference the Terms of Service." *Hugger-Mugger*, 2005 WL 2206128, *5. The same cannot be said for the Disclosure and Liabilities statement contained on

Plaintiffs' invoice.

The Court finds that the fifth statement on the second page of Plaintiffs' invoice, entitled "Agreement (Disclosure and Liabilities)," is insufficient to incorporate by reference the separate Disclosure and Liabilities Agreement found on Defendant's website. The language does not betray a clear intent that the Disclosure and Liabilities Agreement be considered part of the contract between the parties. *NILAC, supra.* Nothing in the statement clearly indicates that the Disclosure and Liabilities Agreement applies to the service contract between the parties, that it forms any part of the agreement between the parties, or that it is intended to be incorporated into the agreement between the parties. The statement merely informs the reader of where to find "NECC's Agreement 'Disclosure and Liabilities.'" Further, the statement is the last of five statements, written in plain text, on the second page of the invoice. There are no allegations of any other references to the Disclosure and Liabilities Agreement either in writing, or in the verbal dealings with Defendant. Thus, the Disclosure and Liabilities Agreement is not incorporated by reference, and accordingly, the arbitration provision contained therein is unenforceable.

## B. Are Plaintiffs' Claims Preempted By State Law?

Defendant argues that even if the arbitration provision does not apply, Plaintiffs' state law claims must be dismissed because they are preempted.

"The doctrine of preemption springs from the Supremacy Clause of the Constitution: 'the Constitution and the Laws of the United States which shall be made in Pursuance thereof shall be the supreme Law of the Land.'" *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 782 (6th Cir. 1996)(citing U.S. Const., art. VI, cl.2). Based on the intent of Congress, state law must yield to conflicting federal law. *Id*. State law can be preempted in three ways: (1) Congress may enact a

federal statute that expresses a clear intent to preempt state law; (2) absent express preemption, Congress may impliedly preempt state law by pervasive regulation that "occupies the field;" and (3) state law is preempted where it actually conflicts with federal law to the extent that compliance with both federal and state regulations is impossible. *Id*. at 782-783.

Defendant argues Plaintiffs' state law claims are preempted by the Federal Telecommunications Act ("FTA"):

> All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful...The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

47 U.S.C. §201(b).

In this case, the parties dispute whether Plaintiffs' claims challenge the reasonableness of Defendant's practices or fees. Plaintiffs allege that their state law claims "hinge (in part) on a failure to disclose certain practices/fees." [Response, p.10]. According to Plaintiffs, Defendant said they would be charged a specific rate, the reasonableness of which Plaintiffs do not challenge, and that there would be no additional service charges. However, Plaintiffs claim they were charged additional service fees. Plaintiffs contend that the crux of their claims is the failure to disclose the additional fees, not the reasonableness of the additional fees. Plaintiffs further contend that their remaining claims based on the discrepancy between the itemized calls and the total are not preempted because they do not challenge whether the terms and conditions are unreasonable or unconscionable. Instead, Plaintiffs argue the terms and conditions were applied incorrectly.

In order to understand the parties' arguments, a brief history of the FCA is helpful. At its

inception, the FCA required long-distance carriers to file a "tariff" that contained their rates, terms and conditions. Regardless of what they advertised, these were the rates carriers were held to. This was a mechanism for Congress to assure uniformly reasonable rates nationally. The FCC had the power to modify or disapprove of tariffs. Courts treated tariffs as federal regulations and applied federal preemption broadly to any claim involving the rates, terms and conditions of a long-distance carrier. However, amendments to the FTA in 1996 gave the FCC the power to exempt carriers from filing tariffs. The rates, terms and conditions were governed instead by individual contracts between the carrier and its customer. In 2001, the FCC mandated "detariffing" and the tariff requirement was cancelled altogether. There is a split in the circuits who have considered the issue, on whether preemption still applies in light of the abolition of federally filed tariffs. The Sixth Circuit has not addressed the issue.

In this case, the parties rely primarily on three cases, *In re Long Distance Telecommunications Litigation*, 831 F.2d 627 (6th Cir. 1987); *Boomer v. AT&T Corporation*, 309 F.3d 404 (7th Cir. 2002); and *Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665 (7th Cir. 2005). In *In re Long Distance*, decided prior to detariffing, the Sixth Circuit held that the plaintiff's state law claim for fraud based on a failure to disclose the practice of charging for uncompleted calls was not preempted by the FTA. The court ruled that the claim did not require agency expertise and was within the conventional experience of judges. *Id*. at 633. The court noted that if the claim "related to rates or service rather than the failure to disclose" it may be preempted. Lastly, the court stated that state law actions are preserved against regulated companies "where the activity in question is a failure to inform customers of a practice, not an attack on the practice itself." *Id*. at 634 (citing *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290

(1976)).

In the Seventh Circuit cases *Boomer* and *Dreamscape*, the court held the plaintiff's state law claims were preempted. In *Boomer*, the plaintiff alleged the defendant overcharged for contributions to the federal universal services fund. For part of the plaintiff's claim, a customer service agreement governed. The plaintiff sought to invalidate the contractual arbitration provision contained in the customer service agreement pursuant to state law. The court determined that the plaintiff's claim was preempted. Relying on 47 U.S.C. §§201(b) and 202(a), the court found that the congressional intent behind the Communications Act was to ensure customers of long-distance carriers received uniform terms and conditions. The court found that allowing the plaintiff to challenge the arbitration provision contained in the service agreement based on state law would: (1) result in customers receiving different rates based on their locality; (2) affect the rate structure because the arbitration provision allowed the carrier to offer lower rates; and (3) violate §201 which according to the court required that federal law govern the validity of terms and conditions. *Boomer*, 309 F.3d at 418. The plaintiff argued that since detariffing, the preemption of state law that arose from the requirement that carriers file a tariff and are precluded from charging fees different than what is in the tariff, no longer exists because the tariff requirement is abolished. The court disagreed, holding that the tariff requirement was merely the mechanism chosen by Congress to assure compliance with §§201 and 202. Following detariffing, according to the *Boomer* court, the goal of just and reasonable rates remains, as do the substantive requirements of §§201 and 202. Thus, "detariffing does not alter the fundamental design of the Communications Act, nor modify Congress's objective of uniformity in terms and conditions for all localities." *Id*. at 422. Consequently, the *Boomer* court ruled that federal law

13

still applies to determining the reasonableness of rates, terms and condition, and state law challenges are still preempted.

In *Boomer*, the plaintiff also directed the court to FCC orders to support his position. Following detariffing, several large carriers submitted a request for clarification that federal, and not state law, governs the determination as to whether a carriers rates, terms and conditions are lawful. The FCC responded:

> ...the Communications Act continues to govern determinations as to whether rates, terms, and conditions for...services are just and reasonable, and are not unjustly or unreasonably discriminatory. While the parties only sought clarification that the Communications Act governs the determination as to the lawfulness of rates, terms, and conditions, we note that the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment. As stated in the *Second Report and Order*, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.

*Boomer*, 309 F.3d at 422 (citing 12 F.C.C.R. 15056, ¶77). The plaintiff in *Boomer* relied on the statements that "the Communications Act does not govern other issues, such as contract formation and breach of contract" and "consumers may have remedies under state consumer protection and contract laws" to support his allegation that state law was no longer preempted. However, the court ruled that plaintiff ignored the FCC's pronouncement that the Communications Act still governs the determination of the reasonableness and discrimination of rates, terms and conditions. The court held that "while state law may determine whether a contract has been formed, federal law still governs the validity of the rates, terms and conditions of the contract." *Id*. at 423.

The Ninth Circuit issued a contradictory opinion, ruling that federal preemption did not

survive detariffing.  *Ting v. AT&T*, 319 F.3d 1126, 1139 (9th Cir. 2003).  The court's decision

relied on the filed tariff doctrine, which it found is the mechanism for barring all claims that

attempt to challenge the rates, terms and conditions contained in a tariff filed with the FCC.  The

court held that any state law claims involving rates, terms and conditions are preempted solely

under the filed tariff doctrine.  According to the *Ting* court, the filed tariff doctrine arose from 47

U.S.C. §203, which required carriers to file the tariff and prevented them from charging fees

different from what is in the tariff.  Thus, according to the *Ting* court, preemption of any claims

involving a challenge to the rates, terms and conditions of a long-distance carrier stemmed from

the "filed rate doctrine" based on §203.  This is contrary to *Boomer*, which relied on §§201 or

202 for preemption.  The *Ting* court found that when the FCC abolished tariffs in 2001,

preemption did not survive because it was based on §203, which is no longer enforced.  The

court stated that when the tariff requirement applied "state law interfered with Congress' chosen

method of rate filing in that, pursuant to the filed rate doctrine, the tariff could not be varied or

enlarged by either contract or tort of the carrier...[f]ederal law therefore preempted state law."

*Ting*, 319 F.3d at 1143.  However, after detariffing, "state law protections are no longer excluded

as they once were under the express terms of the filed rate doctrine."  *Id*.

      The *Ting* court addressed the rulings of the *Boomer* court.  With respect to preemption,

the *Ting* court stated that the *Boomer* court failed to recognize that the substantive standards of

§§201 and 202 are enforceable only if they have an enforcement vehicle such as the tariff filing

requirement.  Without the tariff filing requirement, the court ruled that Congress's new market-

based method ensures reasonableness through competition rather than tariff filing.  "The market

not only encourages carriers to remain flexible, it protects consumers through state contract and

consumer protection laws..." *Ting*, 319 F.3d at 1142.  In addition, the *Ting* court interpreted the

FCC orders as relying on competition to ensure reasonableness, and ruled that in the absence of

tariffs, there is no conflict between federal policy and the use of state law.  *Id*. at 1146.  Applying

this reasoning, the *Ting* court held that California's consumer protection law, and law on

unconscionability, was not preempted by §§201(b) or 202(a).

The Seventh Circuit addressed *Ting* in *Dreamscape*.  In *Dreamscape* the court held that

the plaintiff's claim of fraudulent misrepresentation was preempted.  The plaintiff alleged the

defendant committed fraud by advertising that it charged per minute rates, and then actually

billing based on total call units.  Looking, in part, at the relief demanded by the plaintiff, the

*Dreamscape* court determined that because the plaintiff sought money damages - specifically the

difference between what the defendant advertised and what it charged the plaintiff - resolution

necessarily required invalidating the contract rates at issue.  The court also rejected the plaintiff's

argument that federal preemption did not survive detariffing.  The court held that "state law

cannot operate to invalidate the terms and conditions of [long-distance service] contracts."

*Dreamscape*, 414 F.3d at 673.  The court reaffirmed its reasoning in *Boomer* and stated that it

was unpersuaded by *Ting*.  *Id*. at 674.

Both the Seventh Circuit and the Ninth Circuit holdings miss the mark.  The *Ting* court is

correct that preemption was based on §203's tariff filing requirement.  Based on the law prior to

detariffing, a plaintiff could not maintain a breach of contract claim because the only thing that

regulated rates, terms and conditions was the tariff, regardless of what representations the carrier

might have made.  The Communications Act provided that the tariff was to be applied and could

not be deviated from.  Accordingly, a plaintiff could not maintain an action challenging rates,

16

terms or conditions because the claim could affect the tariff. However, the abolishment of tariffs and enforcement of §203 does not effectively end preemption as the *Ting* court contends. The fact that courts have routinely relied on §203 for preemption does not mean that other statutes could not also support preemption. It is just that until detariffing, there was no reason to consider whether other statutes resulted in preemption.

The Seventh Circuit reasoning is also erroneous because it attempts to treat customer service agreements, *i.e.* contracts, the same as tariffs were treated under the Communications Act. The *Dreamscape* court held that "state law cannot operate to invalidate the rates, terms, or condition of a long-distance service contract...because such a result would be contrary to Congress's intent as expressed in Sections 201 and 202." *Dreamscape*, 414 F.3d at 674. Nothing in §§201 or 202 supports a finding that a customer service agreement, once entered, cannot be invalidated by state law. Rather, §§201 and 202, viewed outside of §203, only preempt state law to the extent that a plaintiff challenges the reasonableness or discriminatory effect of a rate, term or condition in the contract. Actions based on state law that do not challenge the reasonableness of a rate, term or condition, such as claims based on contract formation and breach of contract are not preempted.

A review of FCC rulings support this conclusion. The FCC found that tariffs were not necessary to ensure that the rates, practices and classifications of carriers were just and reasonable and were not unjustly or unreasonably discriminatory. 11 F.C.C.R. 20730, ¶21. The FCC decided that by deregulating, market forces would ensure justness and reasonableness. However, §§201 and 202 would still be available to remedy any illegal conduct. *Id.* The FCC announced that it was not departing from its commitment to protect consumers from

anticompetitive practices, and still pledged to vigorously enforce statutory and regulatory safeguards. *Id*. at ¶5. It also stated "when...services are completely detariffed, consumers will be able to take advantage of remedies provided by state consumer protection laws and contract law against abusive practices." *Id*. The FCC further stated that its process of investigation was adequate to redress any violations of §§201 or 202, but additionally, "in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the "filed-rate" doctrine." *Id*. at ¶38.

The FCC did not envision that detariffing would absolve the federal government of the duty and obligation to ensure the reasonability of rates, terms and conditions; instead it would allow carriers to compete in the market and contract directly with consumers. The FCC realized that this shift in its method of ensuring the justness and reasonability of rates, terms and conditions eliminated the strict preemption required by federally registered tariffs and §203. In its place is a system where the goals of the FTA are still protected by federal law, as state law claims challenging the reasonableness of rates, terms and conditions are preempted. But, the method of garnering a contract with a consumer is left to state law, *e.g*., actions involving contract formation, breach of contract and fraudulent misrepresentation. As the *Ting* court pointed out, there is no federal common law of contracts that the federal courts could even apply. Resort to state law is necessary for these types of actions.

The FCC sought to create a "legal relationship between carriers and customers [that] will much more closely resemble the legal relationship between service providers and customers in an unregulated environment." 11 F.C.C.R. 20730, ¶55. The formation of that "legal relationship" is governed by state law. But, it is not exactly the same as the general relationship between service

providers and customers, because the underlying reasonableness of rates, terms and conditions is subject to federal law, hence the term "closely resemble." The FCC further supported this interpretation in its response to several carriers' requests for clarification mentioned *supra*. As summarized by the FCC, the carriers argued that state law did not apply to the lawfulness of rates, terms and conditions for long-distance service. The carriers were concerned that the sentence "consumers will also be able to pursue remedies under state consumer protection and contract laws" announced in 11 F.C.C.R. 20730, would lead to a different interpretation. The carriers sought a ruling from the FCC that "any interpretation that authorizes such challenges under state law is foreclosed by numerous judicial decisions recognizing that sections 201 and 202 of the Communications Act preempt state law with respect to the reasonableness of rates, terms, and conditions for interstate telecommunications services." 12 F.C.C.R. 15056, ¶1. The FCC stated that it agreed with the carriers and that the Communications Act continues to govern determinations as to whether rates, terms or conditions are unjust or unreasonable. *Id*. at ¶2. However, the FCC went on to state that the Communications Act does not govern other issues like contract formation and breach of contract and that "consumers *may* have remedies under state consumer protection and contract laws *as to issues regarding the legal relationship between the carrier and customer in a detariffed regime*." *Id*. (emphasis added). Clearly, the FCC did not intend to eliminate all preemption as apparently held in *Ting*; and, it did not treat contracts between carriers and consumers as tariffs, as *Boomer* and *Dreamscape* did.

The Court applies this reasoning to the consideration of Plaintiffs' state law claims.

### 1. Breach of Contract

Assuming there are no issues involving contract formation, the court must determine

whether Plaintiffs' claim for breach of contract is preempted. Plaintiffs appear to assert an oral contract created by Defendant during telephone solicitation. Plaintiffs claim they were told they would be charged a specific rate and that there would be no additional charges. [First Amended Complaint, ¶24]. Nonetheless, Plaintiffs assert they were charged additional fees, as shown on their monthly invoices. *Id*. at ¶¶26 and 27. Further, it is undisputed that at least with respect to the invoices referenced in Plaintiffs' Complaint, there was a mathematical error in the charges. *Id*. at ¶28. The error resulted in Plaintiffs overpaying. Plaintiffs claim this was not an isolated occurrence.

Defendant does not argue that Plaintiffs fail to state a claim for breach of contract. The only argument for dismissal of this claim is that it is preempted by the FTA. As discussed above, claims for breach of contract that do not require the assessment of the reasonableness of rates, terms or conditions are not preempted. Plaintiffs breach of contract claim premised on the charge of fees allegedly not disclosed at the formation of the contract is not preempted because the court does not have to consider whether the fees were reasonable. Resolution of this claim only requires the court to decide whether the fees were part of the contract under state law. Likewise, Plaintiffs' claim that Defendant did not accurately bill them is not preempted. Plaintiffs are not challenging the reasonableness of the fees charged by Defendant, rather, Plaintiffs assert that Defendant failed to accurately tally the charges. While Defendant argues that Plaintiffs fail to point to a contract provision requiring accurate billing, any contract requiring billing entails the implication that the billing will be done accurately. Common sense also supports this conclusion. Thus, because Plaintiffs action is one for a breach of contract that does not require the determination of the reasonableness of Defendant's rates, terms or

conditions, it is not preempted.

### 2. Breach of Duty of Good Faith and Fair Dealing

Plaintiffs claim of breach of the duty of good faith and fair dealing is premised on the same conduct, and thus not preempted. However, Defendant also maintains that Plaintiffs fail to state a claim.

In their Response, Plaintiffs agree with Defendant's statement of the law in Michigan that a duty of good faith and fair dealing is only recognized "where one party to the contract makes its performance a matter of its own discretion." [Response, p.15 (citations omitted)]. Plaintiffs make the strained argument that because the Disclosure and Liabilities Agreement, which Plaintiffs do not concede applies, reserves the right for Defendant to modify the terms of the agreement, Plaintiffs state a claim. This is unavailing. As discussed above, the Disclosure and Liabilities Agreement is not a part of the contract between the parties. Whether Defendant performs is not discretionary, thus Plaintiffs fail to state a claim. Plaintiffs' claim of breach of the duty of good faith and fair dealing is dismissed.

### 3. Fraud and Negligence

Plaintiffs allege fraud and negligence stating that Defendant purposefully overcharged them by falsely representing that there would be no additional fees and that their bills would be accurate. Acting in reliance on these representations, Plaintiffs agreed to service with Defendant and paid the amount shown on their invoices. Plaintiffs further allege that Defendant owed a duty to properly charge them for telephone service.

It is not necessary to decide if these claims are preempted because Plaintiffs fail to state a claim. Defendant argues that Plaintiffs fail to state claim for fraud or negligence because they do

not allege any misfeasance to support tort that is separate from the breach of contract. Plaintiff does not respond to this argument.

The Michigan Supreme Court held in *Rinaldo's Construction Corporation v. Michigan Bell Telephone Company*, 454 Mich. 65, 83 (1997), that "[a]s a general rule, there must be some active negligence or misfeasance to support a tort...[t]here must be some breach of duty distinct from breach of contract." (citation omitted). Put another way, "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not." *Id*. at 84 (citation omitted). In this case, Plaintiffs failed to meet the threshold inquiry of alleging a violation of a legal duty separate and distinct from the contractual obligation. *Id*.

Accordingly, Plaintiffs claims for fraud and negligence is dismissed.

### 4.      Unjust Enrichment

Plaintiffs assert a claim for unjust enrichment. Again, it is not necessary to determine preemption because Plaintiffs fail to state a claim. It is axiomatic that a court will not imply a contract where an express contract exists covering the same subject matter. *Belle Isle Grill Corp. v. Detroit*, 256 Mich.App. 463, 478 (Mich.App. 2003). However, Plaintiffs argue their claim should not be dismissed because Defendant denies the existence of a contract and they are pleading in the alternative.

A glance at Defendant's Motion makes it clear that Defendant does not deny the existence of an express contract. In fact, the majority of Defendant's Motion is spent arguing for the application of the arbitration provision from the contract it alleges applies. The parties only appear to disagree over whether the contract includes the terms contained in the Disclosure and

Liabilities Agreement posted on Defendant's website. "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract...[i]n other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract." *Moon v. SCP Pool Corporation*, 2007 WL 80975 (E.D.Mich. 2007)(citing *Advanced Plastics Corporation v. White Consol. Industries, Inc.*, 828 F.Supp. 484, 491 (E.D.Mich. 1993); *Shurlow Tile and Carpet Company v. Farhat*, 60 Mich.App. 486, 491 (Mich.App. 1975); and *Campbell v. Troy*, 42 Mich.App. 534, 537 (Mich.App. 1972)). See also *Pumps v. Centerline Piping, Inc.*, --- N.W.2d ----, 2006 WL 3615682 at *6 (Mich.App. 2006)("rules...allowing simultaneous and alternative claims for breach of contract and unjust enrichment, no longer appear to be good law when both claims are asserted against the same defendant, with whom the plaintiff has an express contractual relationship.").

Accordingly, Plaintiffs' claim for unjust enrichment is dismissed.

### 5. Michigan Consumer Protection Act

Plaintiffs allege a violation of the Michigan Consumer Protection Act ("MCPA") based on Defendant's alleged false representation that it accurately calculated the charges and fees billed to Plaintiffs [Amended Complaint, ¶74]; and Defendant's failure to reveal the incorrect charges and fees. Specifically, Plaintiffs cite the following sections of the MCPA:

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.
* * *
(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

23

&ast; &ast; &ast;

(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

MCL 445.903(1). Plaintiffs claims based on the MCPA sections cited in their Amended Complaint are not preempted because they do not challenge the reasonableness or discriminatory effect of Defendant's rates, terms or conditions. Instead, they challenge Defendant's allegedly deceptive misrepresentations. Defendant does not argue that Plaintiffs fail to state a claim.

### C.    Is There A Private Cause Of Action For Plaintiffs' Federal Claims?

The parties agree there is a private cause of action for violations of 47 U.S.C. § 201(b). [Reply, p.8]. However, Defendant contends there is no private cause of action under 47 U.S.C. § 201(b) based on a violation of 47 C.F.R. § 64.2401. The ultimate question is whether violation of 47 C.F.R. § 64.2401 is an unreasonable practice for purposes of 47 U.S.C. § 201(b).

Both parties direct the Court to the newly issued Supreme Court opinion, *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc*., 127 S.Ct. 1513 (2007). In *Global Crossing*, the FCC regulation at issue required long-distance carriers to pay a set rate of compensation to payphone operators for calls made on their payphones. 47 CFR § 64.1300(d). The Court noted that the FCC subsequently determined that it was an "unreasonable practice" within the meaning of § 201(b) to fail to comply with the regulation. *Global Crossing*, 127 S.Ct. at 1518. The issue before the Court was whether violation of the FCC regulation was sufficient to support a cause of action under 47 USC § 207 for violation of § 201(b). The Court held that it is clear that § 207 covers actions that complain of a violation of § 201(b) as lawfully implemented by an FCC regulation. *Id*. at 1520. The Court ruled that the difficult question was whether the regulation lawfully implements § 201(b)'s unreasonable practice prohibition.

In analyzing the question, the Court looked to the FCC's ruling. The Court found that the FCC's determination that failing to comply with a regulation that requires payment of compensation to payphone operators is an 'unreasonable practice' was a reasonable, and hence lawful, determination under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, there is a two step process for reviewing the validity of an agency regulation. "First, we ask whether Congress has directly spoken to the precise question at issue...[i]f Congress's intent is clear, that is the end of the matter." *Wachovia Bank v. Watters*, 431 F.3d 556, 560-561 (6th Cir. 2005). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* Any ambiguities require the court to give "great weight" to any reasonable construction of the statutes by the agency. *Id.* The Court found that the FCC's determination that failure to comply with 47 CFR § 64.1300(d) "easily fits within the language of the statutory phrase." *Global Crossing*, 127 S.Ct. at 1520. Tracking the language of § 201(b), the Court stated "one can call a refusal to pay Commission-ordered compensation despite having received a benefit from the payphone operator a 'practice ... in connection with furnishing a communication service ... that is ... unreasonable.'" *Id.*

In this case, there is no agency ruling regarding whether violation of 47 C.F.R. § 64.2401 is unreasonable for purposes of § 201(b). Defendant asks this Court to proceed without the benefit of an FCC ruling, and determine on its own whether violation of § 64.2401 is unreasonable under § 201(b). Plaintiff argues that the issue was ruled on during an FCC rulemaking when it stated that "a carrier's provision of misleading or deceptive billing information is an unjust and unreasonable practice in violation of § 201(b) of the Act." *In re*

*Truth-in-Billing and Billing Format*, 14 F.C.C.R. 7492, 7506 (1999).  Defendant responds that unlike the post-rulemaking decision relied on by the Court in *Global Crossing*, in this case the FCC has not made an unequivocal ruling that violation of 47 C.F.R. § 64.2401 is unreasonable under § 201(b).

The comment made during the rule making is not an agency ruling suitable for review. First, the FCC did not address whether any violation of 47 C.F.R. § 64.2401 would be unreasonable for purposes of § 201(b).  Moreover, review for the reasonableness of an agency decision requires the court to consider whether the agency's interpretation is based on a permissible construction of the statute.  Because the FCC merely commented in general, the court cannot review the statutory construction it relied on.  Thus, the comment in 14 F.C.C.R. 7492 is insufficient to provide the type of review, and determination, made in *Global Crossing*.

Pursuant to the "primary jurisdiction doctrine," the court will stay the proceedings pending resolution by the FCC of the question of whether violation of 47 C.F.R. § 64.2401 is an unreasonable practice under § 201(b).  "The doctrine of primary jurisdiction arises when a claim is properly cognizable in court but contains some issue within the special competence of an administrative agency."  *U.S. v. Any and All Radio Station Transmission Equipment, et al.*, 204 F.3d 658, 664 (6th Cir. 2000).  There is no formula for applying the doctrine.  *Id.*  "Rather, in every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."  *Id.* "Those reasons, broadly speaking, are the desire for uniformity in adjudication and the belief that the decisionmaker with the most expertise and broadest perspective regarding a statutory or regulatory scheme will be most likely to resolve the issue correctly."  *Id.*  The doctrine of primary

jurisdiction has further been explained as follows:

> In cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Miranda v. Michigan*, 141 F.Supp.2d 747, 758-759 (E.D.Mich. 2001)(citing *In re Long Distance Telecommunications Litigation*, 831 F.2d 627, 629-630 (6th Cir. 1987).

Before this court can determine whether Plaintiff states a private cause of action for violation of 47 C.F.R. § 64.2401, the FCC must determine whether violation of § 64.2401 is an unreasonable practice in violation of 47 U.S.C. § 201(b). "Courts have consistently held that claims of unjust and unreasonable practices under § 201(b) of the Federal Telecommunications Act fall within the primary jurisdiction of the FCC." *Miranda*, 141 F.Supp.2d at 759 (citing cases). "As the Sixth Circuit has stated 'Section 201(b) speaks in terms of reasonableness, ... a determination that Congress has placed squarely in the hands of the FCC.'" *Id*. (citation omitted). See also *Kiefer v. Paging Network, Inc.*, 50 F.Supp.2d 681, 682 (E.D.Mich. 1999)(remanding question regarding the reasonableness of the defendant's billing practices under § 201(b) to the FCC based on the primary jurisdiction doctrine).

Accordingly, this Court stays the proceedings pending a ruling by the FCC on whether violation of 47 C.F.R. § 64.2401, as alleged by Plaintiff, is an "unreasonable practice" for purposes of 47 U.S.C. § 201(b).

## V.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to compel arbitration,

and **GRANTS** in part, and **DENIES** in part, Defendant's Motion to dismiss.  Plaintiffs' claims

for: (1) breach of the duty of good faith and fair dealing; (2) fraud; (3) unjust enrichment; and (4)

negligence are dismissed.  Plaintiffs' claims for: (1) violation of 47 U.S.C. §§201(b), 206 and

207; (2) breach of contract; and (3) violation of the Michigan Consumer Protection Act remain.

Further proceedings are **STAYED** pending resolution by the FCC of Plaintiff's claim for

violation of 47 C.F.R. § 64.2401.

**IT IS SO ORDERED.**

**S/Sean F. Cox**
**Sean F. Cox**
**United States District Judge**

**Dated:  September 18, 2007**


**I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 18, 2007, by electronic and/or ordinary mail.**

**S/Jennifer Hernandez**
**Case Manager**

28